United States District Court
Southern District of Texas

**ENTERED**

July 11, 2023

Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| TARGETED JUSTICE, INC., *et al*., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL CASE NO. H-23-1013 |
| | § | |
| MERRICK GARLAND *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

The plaintiffs allege that a massive government surveillance and security program has inflicted grave physical and psychological injury on them.  Targeted Justice, Inc., describes itself as a Texas-based nonpartisan and nonprofit corporation that seeks to protect the interests of people it characterizes as "targeted individuals."  Targeted Justice and several "targeted individuals" have sued the allegedly responsible government agencies and individuals in their official and personal capacities for declaratory and injunctive relief.  The plaintiffs have moved for a preliminary injunction, (Docket Entry No. 14), and the defendants have moved to dismiss both the official and personal capacity claims against them.  (Docket Entry Nos. 41, 60).

For the following reasons, the court grants the motions to dismiss, with prejudice except as to the individual plaintiffs' Privacy Act claims, denies the motion for a preliminary injunction, and denies most remaining motions as moot.[1]

---

[1] These motions include:  George Benavides's motions to intervene, to file electronically, for leave to file a brief as amicus curiae, and to strike (Docket Entry Nos. 21, 34, 39, 62, 63, 72); the plaintiffs' motion to compel limited discovery (Docket Entry Nos. 37, 51); the plaintiffs' motion for oral argument (Docket Entry No. 53); and the plaintiffs' motions for judicial notice, (Docket Entry Nos. 58, 61, 70).  Several other items on the docket appear to have been mistakenly filed as motions.  (*See, e.g.*, Docket Entry No. 12). There are also several administrative motions filed both before and after this case was transferred to the Houston Division that have been mooted by the passage of time.  (*See, e.g.*, Docket Entry Nos. 22, 52).

I.      **Background**

The following summary is taken from the plaintiffs' amended complaint.  The plaintiffs

allege the existence of a malicious government program of experimentation and persecution that

they call the "Program."  The individual plaintiffs allege that they are "Targeted Individuals," that

is, individuals targeted and victimized by the Program.  They allege that they have been targeted

and injured by "directed energy weapons," "voice-to-skull" technology, and that they suffer from

"Havana syndrome."  They allege that the government has engaged in illegal physical and

electronic surveillance against them. Targeted Justice itself alleges that it represents the interests

of "targeted individuals" by "educat[ing] the public" with the goal of "stopping the illegal

surveillance, organized stalking, and global use of Directed Energy Weapons and torture against

civilians within and outside the United States." (Docket Entry No. 26 ¶ 43).  One of the individual

plaintiffs, Dr. Leonid Ber, is a member of Targeted Justice's advisory board.  (*Id.* ¶ 47).  The

remaining individual plaintiffs have not alleged that they are members of Targeted Justice.

The defendants are the Federal Bureau of Investigation, the Department of Homeland

Security, and individual governmental officials sued in both their professional and personal

capacities.  These officials are FBI Director Christopher Wray, Attorney General Merrick Garland,

Terrorist Screening Center Director Charles Kable, Department of Homeland Security Secretary

Alejandro Mayorkas, and the Department's Undersecretary for Intelligence and Analysis, Kenneth

Wainstein.

The plaintiffs allege that they are included in the Terrorist Screening Dataset, formerly and

interchangeably known as the Terrorist Screening Database, and that this inclusion made them

---

These motions are denied as moot, except for the plaintiffs' motion for judicial notice at Docket Entry No.
61, and their motion for leave to file excess pages, (Docket Entry No. 66), which are granted.

targets of the government.  They allege that the Dataset is produced by the Terrorist Screening

Center, a multiagency organization administered by the FBI.  The Dataset contains the names of

known or suspected terrorists.  Names may be added to the Dataset through a nomination procedure

that the FBI and the Terrorist Screening Center oversee.  (*Id.* ¶ 96).  Any person may submit a

nomination form to the FBI.  (*Id.* ¶ 97).  The plaintiffs allege that defendants Wray and Kable

make the final decision as to whether a person's name should be added to the Dataset.  (*Id.* ¶ 95).

The standard for adding a person to the Dataset is "reasonable suspicion" that the person is engaged

in or associated with terrorist activity.  (*Id.* ¶ 110).

The Dataset contains specific categories.   According to one DHS regulation, these

categories are (1) known or suspected terrorists, (2) aliens excludable because of their associations

with known or suspected terrorists, (3) military detainees, and (4) those known or suspected to be

involved in international organized crime.  (*Id.* ¶ 140).  Another classification system, used by the

FBI, categorizes the individuals in the Dataset to those with known or suspected ties to terrorism

and those who have been misidentified as an individual with known or suspected ties to terrorism.

(*Id.* ¶ 142).  Finally, the plaintiffs allege that "there is yet another 'official' variant of the categories

within [the Dataset]" used by state and local governments.  (*Id.* ¶ 144).  These categories are:

Handling Code 1—Outstanding Arrest Warrant

Handling Code 2—Under Active Investigation

Handling Code 3—Individual [H]as Possible Ties to Terrorism

Handling Code 4—Identity Provided [H]as Possible Ties to Terrorism

(*Id.*).

The plaintiffs attached to their complaint the purported source of these "Handling Code"

categories, a four-page document produced by the Baltimore Police Department entitled "Policy

802, Handling Codes: Terrorist Response," dated September 8, 2016.  (*See* Docket Entry No. 26-

3

10).  The plaintiffs allege that names included in Handling Code 1 comprise the "No Fly List." (*Id.* ¶ 146).  Names included in Handling Code 2 comprise the "Selectee List," which is "supposed to contain the names of suspected terrorists under active investigation."  (*Id.* ¶ 150).

The plaintiffs do not allege that the government has placed them on the No Fly List or other list of "known or suspected terrorists."  (¶ 25).  Instead, they allege that their names are included in the "'Handling Codes 3 and 4' subcategories of the [Dataset] that constitutes 97% of the identities in the entire dataset."  (*Id.*).  The plaintiffs refer to the "Handling Codes 3 and 4" subcategories as the "TSDB NIS McCarthy Blacklist," (*id.* ¶ 25; *see also id.* ¶ 163), or—although this is not completely clear—the "Expanded Selectee List."  (*Id.* ¶ 155 (discussing the "Expanded Selectee List" in the context of Handling Codes 3 and 4 but not affirmatively stating that "Expanded Selectee List" refers to those two codes)).  It is also not clear whether the plaintiffs' references to "Handling Codes 3 and 4" and the "TSDB NIS McCarthy Blacklist" are intended to be synonymous.  (*See id.* ¶ 29 ("By including Plaintiffs' and TJ Members' names in the secret non-terrorist McCarthy blacklist *embedded within* Handling Codes 3 and 4 . . . " (emphasis added))).  The plaintiffs allege that reasonable suspicion is not required for an individual to be included in the Dataset under Handling Codes 3 or 4.  (*Id.* ¶ 162).  They allege that there is no way to challenge one's inclusion in the Dataset or categorization as Handling Code 3 or 4.  (*Id.* ¶ 208).  Each individual plaintiff alleges that he or she made at least one request for information about whether their names are in the Dataset to at least one agency on the following dates:

| Plaintiff | Agency | | |
|---|---|---|---|
| | **FBI** | **DHS** | **Dep't of Justice** |
| Leonid Ber | 11/29/2022 | 11/30/2022 | N/A |
| Karen Stewart | 1/4/2023 | 11/26/2022 | N/A |
| Dr. Timothy Shelley | 12/31/2022 | 12/31/2022 | 12/31/2022 |
| Winter Calvert | 12/1/2022 | 12/2/2022 | N/A |
| Armando Delatorre | 11/2022 (no date) | N/A | N/A |
| Deborah Mahanger | 12/2/2022 | 12/2/2022 | 12/3/2022 |
| Ana Robertson Miller | 12/4/2022 | 12/4/2022 | 12/4/2022 |
| Melody Ann Hopson | 12/12/2022 | 12/30/2022 | 12/30/2022 |
| Devin Fraley | 12/12/2022 | 12/31/2022 | N/A |
| Jason Foust | 12/3/2022 | 12/3/2022 | 12/3/2022 |
| Lindsay Penn | 1/11/2023 | 1/11/2023 | N/A |

(Docket Entry No. 26 ¶ 71). The plaintiffs allege that the agencies either did not respond or responded in cursory fashion to the requests. (*Id.* ¶¶ 72–75). Plaintiffs Ber, Stewart, Shelley, Fraley, and Foust do not allege that they appealed the FBI's responses to their requests under the relevant agency regulations. Plaintiffs Calvert and Delatorre do not allege the nature of the FBI's response to their requests.

Individuals whose names are in the Dataset but not on the No Fly List or Selectee List are not subject to additional screening at airports. Instead, according to the plaintiffs, these names are placed in the Dataset for purposes of the "special screening functions of [the Department of Homeland Security] and the Department of State." (Docket Entry No. 26-2 (Declaration of Timothy P. Groh) ¶ 22 n.7). The plaintiffs refer to this subset of names—individuals subject to exceptions to the "reasonable suspicion" standard—as "non-investigative subjects." (Docket Entry No. 26 ¶ 21) The plaintiffs allege that they are "non-investigative subjects" through their inclusion in the Dataset as members of Handling Codes 3 and 4. Because non-investigative subjects "do not represent a real terrorist threat, they do not face undue hardship or heightened scrutiny when traveling to alert them about their [Database] status." (*Id.* ¶ 165). And because non-investigative subjects are not subject to "travel obstacles," according to the complaint, "only

two Plaintiffs, Calvert and Stewart, have become aware that their names had been included in the TSDB NIS McCarthy b[l]acklist." (*Id.* ¶ 166). Plaintiffs Stewart, Shelley, and Calvert allege, "on information and belief," that they were improperly placed in the Dataset for activity protected by the First Amendment. (*Id.* ¶¶ 108, 236). Plaintiffs Shelley, Olsen, Mendez, and Penn allege, also "on information and belief," that they "became targeted after undergoing" various types of domestic disputes. (*Id.* ¶ 109).

The plaintiffs allege that the FBI makes available the No Fly List and Selectee List "through the National Crime Information Center's (NCIC) database." (*Id.* ¶ 171). The plaintiffs also allege, "on information and belief," that the FBI makes the lists of Handling Code 3 and 4 individuals available through the National Criminal Information Center. (*Id.* ¶ 173). The plaintiffs allege that Wray, Kable, Mayorkas, and Wainstein have disclosed the Dataset, including the plaintiffs' names, to "at least 18,000 state, local, county, city, university and college, tribal, and federal law enforcement agencies," foreign governments, and various private organizations. (*Id.* ¶ 188).

The plaintiffs allege that the government is not authorized to generate and maintain the "Blacklist." (*Id.* ¶¶ 19–21). The plaintiffs allege that Homeland Security Presidential Directive 6 authorizes collection of information only of known or suspected terrorists. (*Id.* ¶¶ 19, 21). They allege that the FBI, Wray, and Kable "have disregarded their oath and obligation to adhere to the limited scope of HSPD-6 and to uphold the laws and Constitution of the United States" by including the names of "hundreds of thousands of innocent" persons—including the plaintiffs— on the Dataset. (*Id.* ¶ 27). As a result, according to the plaintiffs, Wray and Kable have "become virtual jailers of an inescapable Gulag, placing and maintaining innocent civilians such as Plaintiffs and TJ Members in a lifetime torture program by secretly and arbitrability adding their names in

6

the illegal TSDB McCarthy Blacklist." (*Id.* ¶ 31). The plaintiffs allege that Merrick Garland has failed to ensure that the civil rights of those included in the Dataset have not been violated. (*Id.* ¶¶ 135–137).

The alleged consequences of the individual plaintiffs' inclusion on the "blacklist" are many. The amended complaint is 124 pages long. Many of those pages are spent recounting the varied mechanisms of the plaintiffs' injuries, such as directed energy weapons, (*id.* ¶¶ 281–285, 295), Havana Syndrome, (*id.* ¶¶ 286–294), "voice-to-skull auditory harassment," (*id.* ¶¶ 296–302), and "other symptoms." (*Id.* ¶¶ 303–305). The plaintiffs also allege various unlawful acts related to electronic surveillance, (*id.* ¶¶ 306–326), and property destruction. (*Id.* ¶¶ 338–340). Not only do all the plaintiffs suffer these harms, they allege that women are discriminatorily affected. The plaintiffs also allege that they are targeted because of their Republican-party affiliations, violating their First Amendment rights. (*Id.* ¶¶ 327–336).

## II. Analysis

### A. Judicial Notice

The plaintiffs have moved for the court to take judicial notice, (Docket Entry Nos. 58, 61, 70), of the following documents:

1.  Portions of a report, *FBI Whistleblower Testimony Highlights Government Abuse, Misallocation of Resources, and Retaliation*, authored by the House Committee on the Judiciary and the Select Subcommittee on the Weaponization of the Federal Government, dated May 18, 2023. (Docket Entry No. 58-1).

2.  A proposed resolution of the House of Representatives impeaching FBI Director Christopher Wray, dated May 16, 2023. (Docket Entry No. 58-2).

3.  A proposed resolution of the House of Representatives impeaching Attorney General Merrick Garland, dated May 17, 2023. (Docket Entry No. 58-3).

4.  A decision of the U.S. Supreme Court, *TransUnion, LLC v. Ramirez*, 141 S. Ct. 2190 (2021). (Docket Entry No. 61 ¶ 2).

5.      A memorandum from the Office of the Attorney General, *Policies and Procedures Governing Invocation of the State Secrets Privilege*, dated September 23, 2009.  (Docket Entry No. 70-1).

The defendants have not responded to these motions.

The court may take judicial notice of adjudicative facts "generally known within the trial court's territorial jurisdiction; or . . . [which] can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b)(1)–(2).  "Because the effect of judicial notice is to deprive a party of the opportunity to use rebuttal evidence, cross-examination, and argument to attack contrary evidence, caution must be used in determining that a fact is beyond controversy under Rule 201(b)." *Am. Prairie Const. Co. v. Hoich*, 560 F.3d 780, 797 (8th Cir. 2009) (quoting *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc*., 146 F.3d 66, 70 (2d Cir.1998)).  While a court may take judicial notice of documents filed in another court to establish the fact of such litigation and related filings, it may not take judicial notice of the factual findings of another court. *Taylor v. Charter Med. Corp*., 162 F.3d 827, 830 (5th Cir.1998).

The court has no need to take judicial notice of domestic law and the decisions of domestic courts.  *United States v. Schmitt*, 748 F.2d 249, 255 (5th Cir. 1984).  Although unnecessary, the motion for judicial notice at Docket Entry No. 61 is granted.  *See Gray ex rel. Rudd v. Beverly Enterprises-Mississippi, Inc.*, 390 F.3d 400, 407 n.7 (5th Cir. 2004)

The remaining documents are government records.  The Federal Rules of Evidence provide the following exception to the rule against hearsay:

(8) Public Records. A record or statement of a public office if:

(A) it sets out:

(i) the office's activities;

8

> (ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or
>
> (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and
>
> (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

FED. R. EVID. 803(8).  The documents for which the plaintiffs' request notice do not set out the activities a government office, matters observed under legal duties to report, or factual findings from civil or criminal investigations.  These documents remain inadmissible hearsay.  While the court may take judicial notice of the existence of these records, it cannot take notice of the facts they assert—which is what the plaintiffs desire.  (*See, e.g.*, Docket Entry No. 58 ¶ 9).  The motions for judicial notice at Docket Entry Nos. 58 and 70 are denied.

### B.   Subject-Matter Jurisdiction

The defendants argue that the complaint allegations are fantastical and fail to plausibly allege a violation of law.  (Docket Entry No. 41 at 9, No. 60 at 8).  The defendants also challenge the standing of Targeted Justice and its members to bring the claims they assert.

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal for lack of subject-matter jurisdiction.  Additionally, the courts of appeals have stated that Rule 12(b)(1) is the appropriate basis for dismissal when the complaint's allegations are fantastical, bizarre, or "so attenuated and unsubstantial as to be absolutely devoid of merit, wholly insubstantial, obviously frivolous, plainly unsubstantial, or no longer open to discussion."  *Starrett v. Lockheed Martin Corp.*, 735 F. App'x 169, 170 (5th Cir. 2018) (per curiam) (quoting *Hagans v. Lavine*, 415 U.S. 528, 536–37 (1974)).

The court agrees with the defendants that the allegations of the amended complaint are fantastical and, on their face, devoid of merit.  The plaintiffs allege that they have been targeted for physical and psychological harm because they have been placed on a list that they have not

produced, do not possess, and apparently have not seen.  The complaint is littered with references to the unlawfulness of government programs that are simply unrelated to the harms the plaintiffs assert.  The plaintiffs allege that the defendants violated federal law by including their names on a list of individuals who are not known or suspected terrorists, but also allege that that they are targeted "under the guise that they are 'domestic terrorists' that need to be neutralized."  (Docket Entry No. 26 ¶ 272).

To take but one example, the plaintiffs allege that they are targeted for "voice-to-skull" harassment consisting of:

> voice-modulated signals composed of abusive messages, hate speech, and threats, which are beamed at victims for extended periods of time.  It is an extremely debilitating condition as it operates twenty-four hours a day in a continuous flow of computer-generated derogatory verbiage to obliterate the person's psyche such as: "You're stupid; "You're fat"; "Why don't you kill yourself?"

(Docket Entry No. 26 ¶ 301).  Courts have dismissed as fantastical similar claims involving alleged "voice-to-skull" technologies.  *See, e.g.*, *Starrett v. Lockheed Martin Corp.*, 735 F. App'x 169 (5th Cir. 2018); *Grant v. Carns*, No. 22-CV-02932-SVK, 2022 WL 4775890, at *5 (N.D. Cal. Sept. 30, 2022); *Bolden v. Fuerst*, No. 1:22CV377, 2022 WL 1568476, at *2 (N.D. Ohio May 18, 2022).  The complaint here alleges that the defendants are using vast power to regularly broadcast messages directly into the minds of individuals who appear to have little in common other than the belief that they are targets of a government conspiracy.  No more needs to be said.

The complaint has problems beyond its bizarre and incredible allegations.  The plaintiffs lack standing to assert their claims.  "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy," which "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *see also* U.S. CONST. art III § 2. A plaintiff must "clearly . . . allege facts demonstrating," *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990), each element of standing: (1)

an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo*, 578 U.S. at 338 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

The defendants' motions focus on the second element of the standing analysis. The defendants argue that the amended complaint "contains no plausible allegations that these conditions [that the plaintiffs suffer] are the result of any placement in the [Dataset]." (Docket Entry No. 41 at 17). The plaintiffs primarily argue that the motion to dismiss improperly asks the court to resolve disputed facts. The court acknowledges it is required to take the well-pleaded complaint allegations as true and agrees with the defendants that the plaintiffs clearly lack standing.

First, the harms to the plaintiffs all allegedly arise from their inclusion on the "blacklist." But the plaintiffs do not allege that they have a copy of the list, that they have seen their names on the list, or that the list is publicly available. Essentially, the complaint's allegations fall into one of two categories: (1) allegations that the plaintiffs have been harmed; and (2) allegations that the government unlawfully maintains a "blacklist" and engages in targeted attacks on blacklisted individuals. But there is no allegation that the first and second categories are connected. The plaintiffs acknowledge that they are not on the No Fly List or that they have encountered any of the impediments that a person on that list suffers. The plaintiffs' "handling code" terminology is drawn from a Baltimore Police Department document. The plaintiffs acknowledge that the classifications made by the relevant federal agencies, the DHS and the FBI, correspond neither with each other nor with those described by the Baltimore Police Department. Only Calvert and Stewart allege that their names are included on a "blacklist," (Docket Entry No. 26 ¶ 166), but they do not allege how they obtained this information. The complaint is long and detailed, but the only

allegations that a specific plaintiff is on an official "blacklist" are wholly conclusory.  Because the plaintiffs fail to plausibly plead that their names are even on a government blacklist, they lack standing to pursue claims of harm based on their alleged inclusion in such a list.[2]  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411 (2013).  The plaintiffs' alleged harm is not only undefined, it is not traceable to the defendants' conduct.  The allegations that the contents of the blacklist have been disclosed to others do not sufficiently plead that the plaintiffs have suffered a cognizable injury-in-fact.

Targeted Justice makes no allegations that it has been injured by the defendants' conduct.  Targeted Justice may bring a lawsuit on behalf of its members only if it pleads facts that support associational standing.

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd*., 627 F.3d 547, 550 (5th Cir. 2010).  While the interests Targeted Justice seeks to protect are "germane" to its purpose, it has not pleaded facts demonstrating that its members would otherwise have standing to sue in their own right.  Only Ber alleges that he is a member of the organization, and, as stated above, the amended complaint does not allege facts that could show his standing to sue.

The lengthy amended complaint is both fantastical and does not provide a basis for subject matter jurisdiction over the claims, leading the court to find that further amendment would be

---

[2] *TransUnion* does not apply to this case.  In *TransUnion*, the parties stipulated that TransUnion maintained incorrect credit report information for all class plaintiffs.  141 S. Ct. at 2197.  The Court held that those plaintiffs whose incorrect credit information was not distributed to third parties did not suffer "concrete harm."  *Id.* at 2214.

futile. The court accordingly dismisses the plaintiffs' claims, with the exception of the Privacy Act claims, with prejudice.

### C.     Personal Jurisdiction over the Individual Defendants

The individual defendants argue that the plaintiffs have not pleaded facts showing that this court may exercise personal jurisdiction over them. (Docket Entry No. 60 at 10–12). The defendants argue that the court has personal jurisdiction over federal officers, sued in their individual capacities, when they "create and implement policies throughout the fifty states and American territories." (Docket Entry No. 67 at 28).

A federal court may exercise personal jurisdiction over a nonresident defendant when the long-arm statute of the forum state confers personal jurisdiction over that defendant and the exercise of jurisdiction by the forum state is consistent with due process under the United States Constitution. *Delgado v. Reef Resort Ltd.*, 364 F.3d 642, 644 (5th Cir. 2004). The Texas long-arm statute confers jurisdiction to the limits of due process. *Sangha v. Navig8 ShipManagement Priv. Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018); *see also Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex. 1990) ("This court has decided that the broad language of the long-arm's statute's doing business requirement allows the statute to reach as far as the federal constitution permits.").

When the cause of action does not arise from or relate to the nonresident defendant's purposeful conduct within the forum state, the court may have general personal jurisdiction. "[A] court may assert jurisdiction over a foreign corporation to hear any and all claims against [it] only when the corporation's affiliations with the State in which suit is brought are so constant and pervasive as to render [it] essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (internal quotation marks omitted). For a court to exercise general jurisdiction, due process requires that the foreign defendant must have engaged in continuous and systematic

13

contact with the forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–16 (1984); *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 374 (5th Cir. 1987). "Establishing general jurisdiction is 'difficult' and requires 'extensive contacts between a defendant and a forum.'" *Sangha*, 882 F.3d at 101–102 (quoting *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008)). "[E]ven repeated contacts with forum residents by a foreign defendant may not constitute the requisite substantial, continuous[,] and systematic contacts required for a finding of general jurisdiction." *Revell v. Lidov*, 317 F.3d 467, 471 (5th Cir. 2002).

The specific personal jurisdiction inquiry "focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 283-84 (2014) (internal quotation marks and citation omitted); *Halliburton Energy Servs., Inc*. v. *Ironshore Specialty Ins. Co*., 921 F.3d 522, 539 (5th Cir. 2019). The Fifth Circuit applies a "three-step test to determine whether specific jurisdiction exists." *Admar Int'l, Inc. v. Eastrock, LLC*, 18 F.4th 783, 786 (5th Cir. 2021). As the court has explained:

> [f]irst, [the plaintiffs] must show that [the defendants] ha[ve] minimum contacts with [Texas]—that [the defendants] purposefully directed [their] activities at [Texas] and availed [themselves] of the privilege of doing business there. Second, [the plaintiffs] must show that its cause of action arises out of [the defendants'] [Texas] contacts. And third, if [the plaintiffs] satisfy the first two steps, then [the defendants] must show that exercising jurisdiction would prove unfair or unreasonable.

*Id.* (internal citations omitted).

The court agrees with the defendants that it lacks personal jurisdiction over the individual-capacity defendants. When a federal official is sued in his or her individual capacity, courts treat that official like any other individual defendant. *See, e.g.*, *Overton v. United States*, 925 F.2d 1282, 1284 (10th Cir. 1991) (no personal jurisdiction in New Mexico over IRS officer with no contacts with New Mexico); *Smith v. Carvajal*, 558 F. Supp. 3d 340, 349 (N.D. Tex. 2021) (no personal jurisdiction over Bureau of Prisons director with no contacts with Texas other than national

supervisory authority over federal prisons).  No allegations in the complaint suggest that the individual-capacity defendants reside in Texas or that they directed suit-related conduct specifically to Texas.

The claims against the individual-capacity defendants are dismissed for lack of personal jurisdiction.

### D.      Failure to State a Claim

A pleading is deficient and may be dismissed under Rule 12(b)(6) if a plaintiff fails "to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  A complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  The court must "construe the complaint in the light most favorable to the plaintiff."  *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010).

### 1.      *Bivens* Claims

The defendants argue that the plaintiffs cannot maintain their *Bivens* claims.  *Bivens* recognized an implied damages cause of action against federal officials arising directly under the U.S. Constitution.  *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 389, 91 (1971).  *Bivens* concerned violations of the Fourth Amendment's prohibition against

unreasonable search and seizures.  *Id*. at 397.  The Supreme Court subsequently approved a *Bivens* remedy under the Fifth Amendment's due process clause for gender discrimination by a member of the United States Congress.  *Davis v. Passman*, 442 U.S. 228 (1979).  The Supreme Court also approved a *Bivens* remedy under the Eighth Amendment for prison officials' failure to provide adequate medical care.  *Carlson v. Green*, 446 U.S. 14 (1980).  This trio of cases represents the only *Bivens* causes of action recognized by the Supreme Court.  They do not concern circumstances materially similar to those alleged by the plaintiffs here.

For some time, the Supreme Court has "made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity."  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) (quoting *Iqbal*, 556 U.S. at 675).  The Court has repeatedly rejected attempts to sue federal officials for damages in new contexts.  *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) (collecting cases).  In *Egbert v. Boule*, 142 S. Ct. 1793 (2022), the Court emphasized that "[t]he *Bivens* inquiry does not invite federal courts to independently assess the costs and benefits of implying a cause of action."  *Id*. at 1805.  Rather, "[a] court faces only one question: whether there is *any* rational reason (even one) to think that *Congress* is better suited to 'weigh the costs and benefits of allowing a damages action to proceed.'"  *Id*.  (quoting *Ziglar*, 137 S. Ct. at 1858).

The defendants point to the certain "alternative remedial structures" to address the harms caused by an individual's inclusion in the No Fly List.  (Docket Entry No. 60 at 16).  They also point to tort remedies designed to redress some of the particular harms alleged by the complaint, such as stalking, vandalism, and battery.  (*Id.* at 17–18).  While these remedies may not grant the plaintiffs full relief, the inadequacy of available relief is not a sufficient reason to create a new *Bivens* remedy.

Congress has not provided a *Bivens* remedy for violations of the sort alleged here, despite—as the plaintiffs allege—past governmental abuses of similar character.  The plaintiffs point to the Central Intelligence Agency's "MK-ULTRA" program, which concerned research and development into "materials capable of employment in clandestine operations to control human behavior."  *C.I.A. v. Sims*, 471 U.S. 159, 161 (1985).  The program had—in the understated language of the Supreme Court—some "untoward results," including the deaths of at least two individuals.   *Id.* at 162 & n.2.   The plaintiffs also point to COINTELPRO, an FBI counterintelligence program that a Senate committee later found was "a sophisticated vigilante operation aimed squarely at preventing the exercise of First Amendment Rights."  *Jones v. F.B.I.*, 41 F.3d 238, 240 (6th Cir. 1994) (quoting Senate Select Comm. to Study Governmental Operations with Respect to Intelligence Activities, Final Report, S. Rep. No. 94–755, 94th Cong., 2d Sess. (1976)).  But despite the abuses and subsequent condemnation of those programs, Congress did not create a damages cause of action for the individuals they allegedly harmed.  The *Bivens* case law and this congressional inaction are reason enough to conclude that the plaintiffs cannot sue the individual defendants here for damages.[3]

### 2.    Administrative Procedure Act Claims

The Administrative Procedure Act provides that "[a] person suffering legal wrong because of an agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.

The plaintiffs' complaint fails to state a claim under the Act for the same reason it fails to allege subject-matter jurisdiction: the plaintiffs plead only conclusory allegations that they are on

---

[3] As the individual defendants note, (Docket Entry No. 73 at 2), *Bivens* does not provide a basis for injunctive relief.  *See, e.g.*, *Patel v. Santana*, 348 F. App'x 974, 976 (5th Cir. 2009).

the alleged "blacklist," much less harmed by their inclusion in that list.  Only harms attributable to agency action are subject to review under the Administrative Procedure Act.  The plaintiffs' amended complaint does not meet that standard.  The APA claims must be dismissed.

### 3.      Privacy Act Claims

The Privacy Act regulates the executive branch's handling of private information contained within a system of records.  The Act forbids disclosure of such information without the written consent or permission of the subject of the information.  5 U.S.C. § 552a.  The plaintiffs allege that they have been harmed by the improper sharing of their private information between government and nongovernmental agencies.  The plaintiffs seek a declaration that the "FBI and DHS violated the . . . Privacy Act[], for failing to timely and thoroughly respond to Plaintiffs' requests."  (Docket Entry No. 26 ¶ 555(b)).  They also seek an order directing the FBI and DHS to respond to their requests "and provide them with an entire copy of their FBI, TSC, and DHS file."  (*Id.* ¶ 555(f)).

The defendants argue that the Privacy Act claims of the following plaintiffs against the FBI must be dismissed for failure to state a claim: Leonid Ber, Karen Stewart, Timothy Shelley, Winter Calvert, Armando Delatorre, L.M., Lindsey Penn, Ana Robertson Miller, Devin Fraley, and Jason Foust.  (Docket Entry No. 41 at 24).  The defendants argue that the claims of Winter Calvert and Ana Robertson Miller against DHS must be dismissed for the same reason.  (*Id.*).[4]  Specifically, the defendants argue that these plaintiffs failed to sufficiently allege either that the respective agencies improperly withheld records or that the plaintiffs exhausted their administrative remedies.  (*Id.* at 25).  In response, the plaintiffs argue that requiring them to exhaust their administrative

---

[4]  The defendants do not move to dismiss the remaining Privacy Act claims.  (*Id.* at 24 n.11).

remedies would be futile.  (Docket Entry No. 47 at 26).  The plaintiffs also argue that they need not exhaust because the defendants' violations "perpetuate irreparable harm on them."  (*Id.*).

The Privacy Act's exhaustion requirement is not jurisdictional.  *Taylor v. U.S. Treasury Dep't*, 127 F.3d 470, 476 (5th Cir. 1997).  The Privacy Act claims in the amended complaint are, however, conclusory and unclear.  The unexhausted claims are dismissed, without prejudice. If, after exhaustion, the plaintiffs replead, they must do so in compliance with the pleading obligations of Rule 8 and Rule 11.

The unexhausted Privacy Act claims are dismissed, without prejudice.

### E.        Motion for Preliminary Injunction

A preliminary injunction is an "extraordinary remedy."  *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 536 (5th Cir. 2013).  "For a preliminary injunction to issue, a plaintiff must show: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm absent the injunction, (3) that the harm she will suffer without the injunction outweighs the cost to comply with the injunction, and (4) that the injunction is in the public interest." *Harrison v. Young*, 48 F.4th 331, 339 (5th Cir. 2022) (citing *Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't*, 849 F.3d 615, 624 (5th Cir. 2017)).

Certain individual plaintiffs' Privacy Act claims are the only claims that remain in this lawsuit.  The face of the plaintiffs' motion does not suggest that they seek a preliminary injunction on these claims.  (Docket Entry No. 14 at 14 (referring to the "unconstitutional" nature of the TSDB).

There are other reasons to deny the motion.  The record fails to show a likelihood of success on the merits, given the many exceptions to the Privacy Act implicated by the plaintiffs' requests. *See, e.g.*, 28 C.F.R. § 16.96 (exempting from portions of the Privacy Act certain names of individuals collected by the National Crime Information Center and the Terrorist Screening

Center).  Additionally, the plaintiffs' amended complaint allegations that they are included on any blacklist are conclusory, as are the allegations that they suffered harm from having their names on the list.  The plaintiffs cite no authority holding that the government's alleged failure to disclose certain information under the Privacy Act is itself irreparable harm.

The court denies the motion for a preliminary injunction.  (Docket Entry No. 14).

### F.    Other Pending Motions

The dismissal with prejudice of all claims, except for the individual plaintiffs' claims under the Privacy Act, substantially diminishes the scope of this action.  As a result, the court finds it appropriate to deny the remaining outstanding motions, except for Docket Entry No. 61, as discussed above, and Docket Entry No. 66, a motion for leave to file excess pages, as moot.  The denial of these motions is without prejudice to their reassertion if appropriate following the filing of a further amendment complaint.

## III.   Conclusion

The plaintiffs' motion for judicial notice of a judicial decision is granted.  (Docket Entry No. 61).  The plaintiffs' motion for leave to file excess pages is granted.  (Docket Entry No. 66).  The plaintiffs' motion for a preliminary injunction is denied.  (Docket Entry No. 14).

The motions to dismiss, (Docket Entry Nos. 41, 60), are granted, with prejudice, except that the individual plaintiffs' unexhausted Privacy Act claims are dismissed without prejudice and with leave to amend.  The remaining motions are denied as moot.

This case is stayed and administratively closed until the plaintiffs administratively exhaust their Privacy Act claims.  The plaintiffs must move to reopen this case and file an amended complaint no later than 30 days after all of the Privacy Act claims have been exhausted.

SIGNED on July 11, 2023, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge